721 So.2d 562 (1998)
STATE of Louisiana, Appellee,
v.
Robert ANTOINE, DefendantAppellant.
No. 98-369.
Court of Appeal of Louisiana, Third Circuit.
October 28, 1998.
Rehearing Denied December 11, 1998.
*563 Robert Richard Bryant, Jr., Lake Charles, for State.
Mitchell P. Bergeron, for Robert Antoine.
Before DECUIR, AMY and PICKETT, JJ.
AMY, Judge.
In this consolidated criminal matter, the defendants were stopped, in separate, unrelated occurrences, for violation of La.R.S. 32:295.1 which regulates the wearing of seat belts in vehicles. In each of the cases, the defendant argued that La.R.S. 32:295.1 is not a primary offense, i.e., one for which they could initially be stopped, and, therefore, that the stops were unlawful. In one of cases, the defendant's motion to suppress evidence obtained following the stop was granted in this regard. The State now appeals that determination. A contrary result is evident in the remaining case, however, where the lower court convicted the defendant under the statute as well as for subsequent crimes allegedly committed following the stop. The defendant now appeals those convictions. Therefore, at issue in this consolidated matter is whether violation of La. R.S. 32:295.1 is a primary or a secondary offense.

Factual and Procedural Background

Defendant Antoine[1]
On May 20, 1997, Defendant Robert Antoine was stopped, as he was dropping a child off at school. According to the testimony of the arresting state trooper, as he began to issue the citation, Antoine walked away to take the child into the school. The trooper later restrained Antoine in order to arrest him; however, Antoine allegedly resisted arrest and struck the trooper.
On January 22, 1998, Antoine was convicted for failure to wear a seat belt, a violation of La.R.S. 32:295.1, resisting an officer, a violation of La.R.S. 14:108, and battery of a police officer, a violation of La.R.S. 14:34.2. For the seat belt violation, Antoine was sentenced to pay a fine of $10.00 and court costs. In default thereof, Antoine was ordered to serve one day in the parish jail. For resisting an officer, Antoine was ordered to pay a fine of $200.00 and court costs. In the event of default, he was ordered to serve fifteen days in the parish jail. Finally, on the battery charge, the defendant was ordered to pay a fine of $200.00 and to serve fifteen days in the parish jail, which could be served on weekends. The judge ordered that the fines run consecutive and the costs to run concurrent. Antoine was granted sixty days upon release from jail to pay the fines and costs.
Antoine is now before the court applying for a writ of review of these convictions. In particular, Antoine assigns the following assignments of error:
1. The trial court erred in ruling that La.R.S. 32:295.1 alone can form a valid basis for a detention and an arrest.
2. The trial court erred by producing an atmosphere which denied the defendant a fair trial.

Defendant Ellzey
The record indicates that, on October 9, 1997, two state trooper stopped Defendant Dana Ellzey for failure to wear his safety belt. The report of the arresting trooper indicates that while he was talking to Ellzey, he detected alcohol on Ellzey's breath and asked whether he had consumed any alcoholic beverages. Ellzey responded affirmatively and field sobriety tests were conducted. Following these tests, Ellzey was arrested and subsequently charged with failure to wear a safety belt, a violation of La.R.S. 32:295.1, and second offense D.W.I., a violation of La.R.S. 14:98. The defendant filed a motion to suppress seeking suppression of physical evidence and statements made pursuant to what he alleged was an illegal stop and detention. This motion was granted on February 9, 1998. The State now requests review *564 arguing that the trial court erred in granting the defendant's motion to suppress.
These matters originally appeared before the court as writ applications. A panel of this court granted the Joint Motion to Consolidate which was filed by the prosecutor in the Ellzey matter and defense counsel in the Antoine matter due to the same legal issue present in both cases, i.e., whether La.R.S. 32:295.1 is a primary or secondary offense. We now address the merits of the parties' claims in full.
Both appellants' arguments deal with whether, pursuant to La.R.S. 32:295.1, the defendants could be stopped for failure to wear their seat belt. In the Ellzey matter, as previously stated, the lower court concluded that a violation of the statute could not be used as a basis for the stop. In the Antoine matter, however, it was determined that La. R.S. 32:295.1 is a primary offense.
The statute at issue, La.R.S. 32:295.1, provides, in pertinent part, as follows:
A. (1) Each driver of a passenger car, van, or truck having a gross weight of six thousand pounds or less, commonly referred to as a pickup truck, in this state shall have a safety belt properly fastened about his or her body at all times when the vehicle is in forward motion. The provisions of this Section shall not apply to those cars, van, or pickups manufactured prior to January 1, 1981.
(2) A person operating or riding in an autocycle shall wear seatbelts while in forward motion.
....
F. No vehicle, the contents of the vehicle, driver, or passenger in a vehicle shall be inspected, detained, or searched solely because of a violation of this Section.
(Emphasis added.) It is the phrase "inspected, detained, or searched" which we determine the meaning of in the present matter. At issue is whether this language allows a driver to be stopped solely due to a violation of the statute, i.e., for not wearing a seat belt.
In interpretation of this provision, we are mindful of the framework the law gives us for statutory interpretation. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La.Civ.Code art. 9.[2] Furthermore, "[t]he words of a law must be given their generally prevailing meaning." La.Civ.Code art. 11.
However, the Civil Code instructs that "[w]hen the words are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." La.Civ.Code art. 12. Additionally, "[w]hen the language of a law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." La.Civ. Code art. 10.
These concepts of the Civil Code are again expressed in La.R.S. 1:3 which provides, in part, that "[w]ords and phrases shall be read within their context and shall be construed according to the common and approved usage of the language." Within the context of criminal matters, La.R.S. 14:3 provides that:
The articles of [the Louisiana Criminal Code] cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision.
We are further constrained in our consideration of what portions of a provision constitute the law as La.R.S. 1:13 instructs that "[h]eadings to sections, source notes and cross references are given for the purpose of convenient reference and do not constitute part of the law."
With these fundamental precepts in hand, reference to jurisprudence utilizing these statutorily provided guidelines is helpful in understanding the procedural framework *565 required for statutory interpretation. In Theriot v. Midland Risk Ins. Co., 95-2895, p. 3-4 (La.5/20/97); 694 So.2d 184, 186-87, the Louisiana Supreme Court discussed statutory interpretation as follows:
The function of statutory interpretation and the construction to be given to legislative acts rests with the judicial branch of the government. Touchard v. Williams, 617 So.2d 885 (La.1993). The starting point in the interpretation of any statute is the language of the statute itself. Touchard, 617 So.2d at 888. Ambiguous text is to be interpreted according to the generally prevailing meaning of the words employed. La. Civ.Code art. 11. Their meaning may be sought by consulting other laws on the same subject matter. Succession of Baker, 129 La. 74, 55 So. 714 (1911). Where a part of an act is to be interpreted, it should be read in connection with the rest of the act and all other related laws on the same subject. Thibaut v. Board of Com'rs of Lafourche Basin Levee Dist., 153 La. 501, 96 So. 47 (1923).
We have long held that the paramount consideration in interpreting a statute is ascertaining the legislature's intent and the reasons that prompted the legislature to enact the law. Garrett v. Seventh Ward General Hosp., 95-0017 (La.9/22/95); 660 So.2d 841; Touchard, 617 So.2d at 888. Legislative intent is the fundamental question in all cases of statutory interpretation; rules of statutory construction are designed to ascertain and enforce the intent of the statute. State v. Piazza, 596 So.2d 817 (La.1992).
One particularly helpful guide in ascertaining the intent of the legislature is the legislative history of the statute in question and related legislation. Malone v. Cannon, 215 La. 939, 41 So.2d 837 (1949). Laws are presumed to be passed with deliberation and with full knowledge of all existing ones on the same subject. City of New Orleans v. Board of Sup'rs., 216 La. 116, 43 So.2d 237 (1949). We give harmonious effect to all acts on a subject when reasonably possible. Piazza, 596 So.2d at 819.
... Where there is any doubt about the intent or meaning of a law in derogation of long accepted rules, the statute is given the effect that makes the least rather than the most change in the existing body of the law. Touchard, 617 So.2d at 892. Moreover, the time honored maxim expressio unius et exclusio alterius is yet another helpful guide. It teaches us that when the legislature specifically enumerates a series of things, the legislature's omission of other items, which could have been easily included in the statute, is deemed intentional. State v. Louisiana Riverboat Gaming Com'n., 94-1872, 94-1914 (La.5/22/95); 655 So.2d 292. And we have held that the legislature is presumed to act with full knowledge of well settled principles of statutory construction. Monteville v. Terrebonne Par. Con. Gov't, 567 So.2d 1097 (La.1990).
Furthermore, citing Theriot, 694 So.2d 184, the Louisiana Supreme Court has expressed these principles once again in Wartelle v. Women's and Children's Hosp., Inc., 97-0744, p. 7 (La.12/02/97); 704 So.2d 778, 782 wherein the court stated:
Legislative intent is the fundamental question in all cases of statutory interpretation. In searching for legislative intent, the legislative history of the enactment in question and contemporaneous circumstances are helpful guides. Laws are presumed to be passed with full knowledge of all existing ones on the same subject and with appreciation of the principles of statutory construction. When there is any doubt about the intent or meaning of a law in derogation of long accepted rules, the statute is given the effect that makes the least change in the existing body of law. Theriot, supra.

In the present case we are faced with a situation where we are called upon to interpret the meaning of the word "detained" as it is used within La.R.S. 32:295.1. One appellant asserts that this term clearly would include a "stop" while the other appellant, the State, contends that the statute only prohibits a subsequent detention. While a stop may be impossible without detention in some respect, it is also obvious that stopping someone is *566 not the only interpretation which may be considered a full explanation of the term.[3] Especially as used here, it is unclear whether the legislature intended to allow a police officer to stop a driver for not wearing a seat belt or simply to limit the further detention or search of a driver, vehicle, or passenger after the initial stop. Therefore, because the parameters of the term as used by the legislature are ambiguous, we refer to the statute's history to determine the legislature's intent in enacting the provision.
The version of La.R.S. 32:295.1(F) at issue in this case, that which states that "[n]o vehicle, the contents of the vehicle, driver, or passenger in a vehicle shall be inspected, detained, or searched solely because of a violation of this Section[,]" was enacted by Acts 1995, No. 643 § 1. Prior to the 1995 act, La.R.S. 32:295.1(F) provided as follows: "No vehicle, driver or passenger in a vehicle, shall be inspected, detained, or searched solely because of a violation of or to determine compliance with this Section." Thus, although amended by Acts 1995, No. 643 § 1, the portion of La.R.S. 32:295.1(F) at issue in the present matter, "inspected, detained, or searched ... [,]" remained completely unchanged from the pre-amendment version quoted above.
Despite the similarity of the language used in each version of the statute, the preamble to Acts 1995, No. 643 § 1 provides the following:
AN ACT to amend and reenact R.S. 32:295.1(F) and (G), relative to the required use of safety belts; to allow vehicles and occupants to be stopped or searched[4] because of failure to wear a safety belt; to provide for a period of time in which warnings shall be issued; and to provide for related matters.
Thus, the preamble, although not part of the law, see La.R.S. 1:13, would indicate that the legislature contemplated changing the provision, a provision understood by the legislature as previously constituting only a secondary offense.[5] While it would appear, from reference to the preamble alone, that the legislature intended to turn violation of La.R.S. 32:295.1 into a primary offense, the amendment's troubled progression through the legislature, however, reveals countervailing intentions may have also been at work in the revision finally adopted by the legislature.
The minutes of the April 18, 1995 meeting of the House Committee on Transportation, Highways and Public Works, indicates that the bill was presented at that time. These minutes contain the following information regarding the preliminary stages of the amendment:
House Bill No. 1350, which would make the failure to wear a seat belt a primary offense, was presented by Representative Stelly. He informed the committee that the bill provides that persons violating the compulsory safety belt law between September 1, 1995 and October 1, 1995, would be given warning tickets only. After that time, a fine of $25 will be imposed upon conviction.
....
Representative Mitchell moved to report House Bill No. 1350 favorably, to which there was objection. The secretary called the roll, and, by a vote of 11 yeas and 3 nays, the motion passed....
*567 On April 25, 1995, various amendments to the bill were made on the House floor, one of which was to amend the engrossed bill as follows:
F. No vehicle, driver or passenger in a vehicle, shall be inspected detained, or searched solely because of a violation of or to determine compliance with this Section.[6]
Thus, it is obvious that the House, at that point, intended to delete the word detained from the original wording of the statute; such a deletion would have clearly made a seat belt violation a primary offense. Divining the legislative intent for the remainder of the provision's history through the legislative process is not, however, as clear.
The Senate Committee on Transportation, Highways and Public Works met on May 15, 1995. Representative Stelly introduced the bill to the Senate Committee, making the same comments regarding the purpose of the bill that he earlier made in the House Committee meeting. From this point forward, the actions of the legislature become confusing as the Senate Committee reported the bill with amendments, one of which was to add, "detained" after the word "inspected[.]" Thus, following amendment by the Senate, the provision emerged, in its final form, with wording substantively the same as prior to the amendment. However, no change was effected to the preamble which still evidenced a contrary intent. Despite the legislature's apparent intention to make the offense primary, the actual language adopted, inexplicably, would seem to evidence a contrary intent. Although we are not privy to the Senate's reasoning in including "detained" once again, it is this inclusion that makes the legislature's intent less than clear.
Therefore, we are faced with a situation where prior to the 1995 amendment, the legislature clearly felt that violation of La. R.S. 32:295.1 was a secondary offense. They then sought to amend this provision to turn the violation into a primary offense. However, they ultimately adopted identical language, i.e., "inspected, detained, or searched," as in the original secondary offense provision, all with the intention, at least arguably, to make the offense primary. Thus, at best, what we see from the legislative history is a progression of the legislature vacillating with regard to its intentions for the 1995 act under consideration; however, the law did not change, if anything, merely the legislature's intent behind the law changed.
Following amendment to the provision at issue, the Louisiana Attorney General rendered an opinion wherein he made reference to the preamble of the revision in interpreting the revised statute to allow an officer to stop and ticket an individual based solely on a violation of La.R.S. 32:295.1. See Op.Atty. Gen. No. 95-336 (August 17, 1995) citing Green v. Louisiana Underwriters Inc. Co., 571 So.2d 610 (La.1990); In re Hamilton, 446 So.2d 463 (La.App. 4 Cir.1984). In that opinion, the Attorney General reasoned as follows:
In the instant case, there is a conflict between the language of LSA-R.S. 32:295.1(F) and the preamble of the Act. However, we find the rules of statutory construction as applied in Hamilton to be controlling. Herein, the preamble of Act 643 clearly indicates that a vehicle may be stopped because of the "failure to wear a safety belt", reflecting legislative intent to characterize this act as a primary traffic offense. Further support for this position is found within the text of the statute, as the law mandates that "each front seat occupant of a passenger car..... shall have a safety belt properly fastened about his or her body at all times when the vehicle is in a forward motion" and further imposes penalties for first and subsequent offenses. See LSA-R.S. 32:295.1(B); LSA-R.S. 32:295.1(G)(1).
The Attorney General further opined that La.R.S. 32:295.1 "merely imposes a limitation upon the further inspection, detention or search of a vehicle solely because the occupant is without a safety belt."
In considering the above-quoted interpretation, courts of our state have held that "[i]t is well established that opinions of the Attorney General are not law; they are not controlling on the courts: at most they are *568 persuasive." Kidd v. Board of Trustees of Teachers' Retirement System of Louisiana, 294 So.2d 265, 269 (La.App. 1 Cir.), writ denied, 301 So.2d 46 (La.1974). In particular, these opinions have been considered persuasive in the absence of cases on point. See State in the Interest of J.M., 97-491 (La.App. 3 Cir. 10/29/97); 702 So.2d 994. Thus, while we consider the Attorney General's opinion, we rely, instead, on our own review of the statutory language and, due to its ambiguous nature, the attendant, and ambiguous as well, legislative history.
In State ex rel. Mims v. Butler, 601 So.2d 649, 655 (La.1992), the Louisiana Supreme Court directed as follows:
Criminal and penal laws are to be strictly construed. State v. McCarroll, 337 So.2d 475, 479 (La.1976); La.R.S. 14:3; State v. Gyles, 313 So.2d 799 (La.1975); State v. Penniman, 224 La. 95, 68 So.2d 770 (1953); State v. Truby, 211 La. 178, 29 So.2d 758 (1947). Furthermore, in interpreting criminal statutes, the doctrine of lenity is to be applied. We recently stated:
The principle of lenity directs that a court construe a criminal statute in favor of the most narrow application when there are serious doubts concerning a meaning of a term. See State v. McCarroll, 337 So.2d 475 (La.1976). Although the doctrine generally relates to the construction of the penalty provision of a statute, the same approach should be taken when a question arises as to the meaning of an otherwise ambiguous term in the definition of a crime.

State v. Ritchie, 590 So.2d 1139, 1149 n. 6 (La.1991) ... In State v. Freeman, 411 So.2d 1068 (La.1982), we explained that:
It is well established that criminal statutes are to be strictly construed and, in the absence of an express legislative intent, any doubt or ambiguity should be resolved in favor of lenity and not so as to multiply the penalty imposed. State v. Boniface, 369 So.2d 115 (La.1979); State v. Cox, 344 So.2d 1024 (La.1977). R.S. 14:3.
Freeman, 411 So.2d at 1072.
In a prior discussion regarding interpretation of criminal statutes, the Louisiana Supreme Court held that:
The principle of lenity developed on the basis that a person should not be criminally punished unless the law has provided a fair warning of what conduct will be considered criminal. 3 N. Singer, at Sec. 59.04. The rule does not merely reflect a convenient maxim of statutory construction, but is based on the fundamental principle of due process that no person should be forced to speculate whether his conduct is prohibited. Dunn v. United States, 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979).
State v. Piazza, 596 So.2d 817, 820 (La.1992).
Applying this reasoning expressed by the Louisiana Supreme Court, we hold that based on ambiguous statutory wording and ambiguity as to the legislature's actions and intent, the prohibition within La.R.S. 32:295.1(F) that no driver shall be detained solely pursuant thereto prohibits not only further detention, but the initial detention, or stop, as well. We so find particularly in light of the fact that the legislature understood "detained" to include a stop prior to the revisions, and, while at least some legislators were engaged in an apparent attempt to make violation of the offense a primary offense, the legislature as a whole nonetheless intentionally reinserted the very term they understood so clearly to prohibit an initial stop, into the amended language. Therefore, while the legislature may or may not have intended to change the statute, we can only say that they chose to do so by retaining the substantive wording limiting applicability of the provision. In sum, the public was given a law that appeared, on its face, unchanged. Given the due process considerations discussed in Piazza, 596 So.2d 817, the ambiguous actions of the legislature require that the statute be interpreted as prohibiting the actions under consideration here. Therefore, La.R.S. 32:295.1(F) cannot be construed as a primary offense.
As Defendant Antoine was stopped solely for violation of La.R.S. 32:295.1, we reverse the defendant's conviction and attendant sentence for failure to wear a seat belt. Within his first assignment of error, Defendant Antoine contends that both the stop and subsequent *569 arrest for failure to wear a seat belt were unlawful and, therefore, that he had a right to resist the unlawful arrest. In brief, his counsel contends that "Mr. Antoine was rightfully walking away from an unlawful detention, then resisted an unlawful arrest. When the defendant slapped the trooper, his action was within the ambit of his right to resist the unlawful arrest." Thus, Defendant Antoine argues that all three of his convictions should be reversed. While, as stated above, the conviction for failure to wear a seat belt should be reversed, we do not conclude that the arrests or convictions for resisting an arrest and battery of a police officer were unlawful.
In City of New Orleans v. Lyons, 342 So.2d 196 (La.1977), the Louisiana Supreme Court declared unconstitutional the ordinance used to arrest the defendant in that case; however, it upheld the defendant's conviction for battery, finding that she was not legally entitled to resist arrest. In so holding, the court reasoned as follows:
The matter at issue here, however, is not resolved by resort to the "lawful arrest" language of Article 108 of the Criminal Code and Article 220 of the Code of Criminal Procedure, for it is entirely another matter to categorize as "unlawful" an arrest in the proper enforcement of a clearly applicable statute or ordinance by a police officer commanded to do so by a duly ordained legislative body, and prior to pronouncement by a constitutionally authorized court that the legislative enactment is unenforceable because unconstitutional.
In this latter instance we do not believe that such an arrest is "unlawful" under these two articles. It may have been illegal, of course, in the sense that through hindsight it was prompted by conduct violating an ordinance later determined invalid. It was not unlawful, however, when we focus upon the officer's conduct in light of the prevailing ordinance which had not, at the time of the occurrence, been invalidated.
In this latter instance the right to personal liberty competes not with a police officer's abusive and self-proclaimed power, but with society's interest in orderly governmental process. Exposing officer and, perhaps, arrestee to retaliatory force may be a price we must pay to protect the personal liberty of a citizen whose conduct violates no law. It is not a price which we should impose upon officer and arrestee where that personal liberty is jeopardized by duly enacted statute, the constitutional test concerning which properly reposes in the court.
We conclude that relator was not legally entitled to resist arrest nor to commit a battery coincident therewith, notwithstanding the fact that we have now determined that the ordinance which she was being arrested for violating is constitutionally null and void.
Id. at 200.
Although the constitutionality of La. R.S. 32:295.1(F) is not at issue, the situation now before us is analogous and, therefore, the reasoning of Lyons, is applicable to the instant matter. While we have determined that a violation of La.R.S. 32:295.1 is a secondary offense, we have done so after considerable examination of the statute and the confusing attendant legislative history. At best, the trooper arresting Defendant Antoine was faced with an ambiguous statute. In fact, the stop was made in the absence of any jurisprudence indicating that violation of La.R.S. 32:295.1 is a secondary rather than primary offense. Further, an opinion of the Attorney General interpreted the statute as one for a primary offense. Therefore, while, as in Lyons, the stop may have been unlawful in hindsight, the stop was conducted at a time when the only persuasive authority as to the interpretation of the statute was the opinion of the Attorney General, an opinion under which the stop would have been valid. The convictions and sentences for resisting an officer and battery of a police officer are affirmed.
Also, for the above-stated reasons, the trial court's granting of the motion to suppress in the Ellzey matter must be reversed. While true that the trial court correctly determined that Ellzey was not properly stopped pursuant to La.R.S. 32:295.1, under the reasoning of Lyons, the motion to suppress was erroneously granted with regard *570 to the evidence related to the subsequent arrest for second offense D.W.I.. Therefore, we reverse the lower court's decision to grant the motion to suppress and remand for further proceedings related to the alleged violation of La.R.S. 14:98.
Trial Atmosphere
In his second assignment of error, Defendant Antoine argues that, should his convictions be affirmed, he should be granted a new trial before a different judge. He argues that, although he wished to testify, "but did not because of the atmosphere at trial." In his brief, Antoine maintains that "[t]he trial court appeared to be more interested in getting the trial concluded quickly, than in giving [him] his rightful day in court." Antoine asserts that several comments made by the court during the trial are evidence of this.[7]
The first comment complained of by the defendant was made after the trial court was told that each side would call only one witness. To this information, the trial judge responded: "Oh good, a quickie." The second comment was made during the State's questioning of the arresting trooper. After the trooper testified that Defendant Antoine had repeatedly said "f_ _ _ you," the prosecutor asked the trooper what the defendant's demeanor was as he refused to accept his citation. The trial judge commented that: "Well, it was obviously bad." The trooper answered that he agreed with the judge that the defendant's demeanor was "obviously bad."
The third statement to which the defendant directs this court's attention is "You have proved whatever is required of the offense so far." This comment arose during the following exchange during the State's questioning of the arresting officer:
A He stated he was tired of the police always messing with him.
Q Did he make any other statements about the police to you?
MR. SLADE:
Objection. Irrelevant.
MR. ROAN:
It goesthis is a statement against interest, Your Honor. It goes to intent, also.
THE COURT:
You have proved whatever is required of the offense so far.
MR. ROAN:
Well, I just want to bring up one more and then I'll
THE COURT:
All right.
The final comment complained of by the defendant arose after defense counsel moved for a "directed verdict"[8] on the grounds that the initial stop was invalid. The trial court told defense counsel that the defendant was detained because he refused to sign the citation. Defense counsel stated that he was aware of no law requiring a person to sign a citation. The judge explained that he was sure of the existence of such a law and that the defendant caused his arrest by failing to sign the citation. Defense counsel further argued that the report said nothing about when the defendant was advised he was under arrest. The judge stated "Motion denied. Call your witness. Put him on the stand; I don't care." Defense counsel responded that he was not going to put his client on the stand. At that point, the judge found the defendant guilty of driving without a seat belt and sentenced him for that offense.
Defense counsel argues that the defendant wanted to testify, but did not do so because of the trial court's desire to end the trial quickly. However, as indicated above, after denying the motion for acquittal, the trial judge stated that defense counsel could call his witness. Defense counsel, however, replied *571 that he was not going to call the defendant. Thus, the defendant was given an opportunity to take the stand, but did not do so. Furthermore, the defendant has not explained what his testimony would have consisted of and how the outcome of the trial would have differed if he had testified.
Placed into context and when the entire transcript of the trial is reviewed, we do not conclude that the defendant was deprived of a fair trial. Furthermore, we note that the defendant apparently makes this argument for the first time before this court. The record is devoid of any motion for new trial or a motion for recusal.
We find this assignment to be without merit.

DECREE
For the foregoing reasons, Robert Antoine's conviction for failure to wear a seat belt is reversed. However, Antoine's conviction and sentences for resisting arrest and battery of a police officer are affirmed.
REVERSED AND SET ASIDE IN PART; AFFIRMED IN PART.
NOTES
[1] This matter was consolidated with 98-333; State v. Dana A. Ellzey. Although each of the defendants' cases are discussed in this opinion, see the companion case for disposition in the Ellzey matter.
[2] See State v. Bennett, 610 So.2d 120 (La.1992) for an application of these basic Civil Code concepts in the interpretation of a statute from the Louisiana Criminal Code.
[3] WEBSTER'S THIRD NEW WORLD INTERNATIONAL DICTIONARY (3d ed.1993) provides the following definitions for "detain:" "1: to hold or keep in or as if in custody ... 2 archaic: to keep back (as something that is due): WITHHOLD 3: to restrain esp. from proceeding: hold back: STOP, DELAY ... 4: to hold the attention of ... syn SEE DELAY, KEEP"

BLACK'S LAW DICTIONARY (6th ed.1990) provides the following definition: "To retain as the possession of personalty. To arrest, to check, to delay, to hinder, to hold, or keep in custody, to retard, to restrain from proceeding, to stay, to stop, to withhold. See Confinement; Custody."
[4] We note that the preamble indicates the intent was to allow vehicles and occupants to be stopped and searched; however, the statute as amended clearly says "no vehicle ... shall be ... searched."
[5] While this preamble, as well as certain comments revealed in the legislative history, indicates that, prior to the 1995 amendment, violation of La.R.S. 32:295.1 was understood to be only a secondary offense, our review of the statute before amendment does not reveal language defining the statute as such.
[6] Wording appearing with strike-over type are deletions from the existing law.
[7] In particular, Defendant Antoine argues that the following comments by the trial court are indicative of a hostile atmosphere: "Oh good, a quickie"; "Well, it was obviously bad"; "You have proved whatever is required of the offense so far" and "... Call your witness. Put him on the stand; I don't care." The defendant also directs this court's attention to a colloquy contained in the record.
[8] This motion will hereinafter be referred to as one for acquittal. See La.Code Crim.P. art. 778.